**SEALED**

FILED
APR 03 2019
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER O'HARA,<br><br>Defendant. | Criminal No.<br><br>**INDICTMENT**<br><br><u>Count 1</u>: 18 U.S.C. § 371: Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks |

**SA19CR0231 OG**

## INDICTMENT

The Grand Jury charges:

### General Allegations

At all times material to this Indictment, unless otherwise specified:

### The Defendant and Related Entities

1. 1stCare MD, Inc. ("1stCare MD") and ProfitsCentric, LLC ("ProfitsCentric"), were Texas business entities purportedly doing business within the Western District of Texas.

2. Defendant Christopher O'Hara, a resident of Guadalupe County, Texas, was an owner and operator of 1stCare MD and ProfitsCentric, which purported to provide marketing and "telehealth" services.

3. Person A, an individual known to the Grand Jury, was the founder, part-owner, and manager of Company A and Company B, which operated international call centers.

**The Medicare Program and Durable Medical Equipment (Generally)**

4.  The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were sixty-five (65) years of age or older, or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b).

5.  Medicare was subdivided into multiple Parts. Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covered physician services and outpatient care, including an individual's access to durable medical equipment ("DME"), such as orthotic devices and wheelchairs. Parts A and B were known as the "original fee-for-service" Medicare program, in which Medicare paid health care providers fees for services rendered to beneficiaries.

6.  Individuals who qualified for Medicare benefits were commonly referred to as Medicare "beneficiaries." Each beneficiary was given a Medicare identification number.

7.  Orthotic devices were a type of DME that included rigid and semi-rigid devices such as ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively "orthotics").

8. DME companies, physicians, and other healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare "providers." To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A healthcare provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for medically necessary services rendered to beneficiaries.

9. Enrolled Medicare providers agreed to abide by the policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers agreed to and were required to abide by the Anti-Kickback Statute and other laws and regulations. Providers were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

10. Medicare reimbursed DME companies and other healthcare providers for services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

11. A Medicare claim for DME reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

12. A claim for DME reimbursement was required to be medically necessary.

Part C - Medicare Advantage

13. Medicare Part C, also known as the "Medicare Advantage" Program, provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed care plans, including health maintenance organizations and preferred provider organizations. Medicare Advantage provided beneficiaries with all of the same services provided by an original fee-for-service Medicare plan, in addition to mandatory supplemental benefits and optional supplemental benefits.

14. To receive Medicare Advantage benefits, a beneficiary was required to enroll in a managed care plan operated by a private company approved by Medicare. Those companies were often referred to as Medicare Advantage plan "sponsors." A beneficiary's enrollment in a Medicare Advantage plan was voluntary.

15. Rather than reimbursing based on the extent of the services provided, as CMS did for providers enrolled in original fee-for-service Medicare, CMS made fixed, monthly payments to a plan sponsor for each Medicare Advantage beneficiary enrolled in one of the sponsor's plans, regardless of the services rendered to the beneficiary that month or the cost of covering the beneficiary's health benefits that month.

16. Medicare Advantage beneficiaries chose to enroll in a managed care plan administered by private health insurance companies, health maintenance organizations, or preferred provider organizations. A number of entities were contracted by CMS to provide managed care to Medicare Advantage beneficiaries through various approved plans. Such

plans covered DME and related health care benefits, items, and services. Among its responsibilities, these Medicare Advantage plans received, adjudicated and paid the claims of authorized suppliers seeking reimbursements for the cost of DME and related health care benefits, items, or services supplied to Medicare Advantage beneficiaries.

## Count One

### Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
### [Violation of 18 U.S.C. § 371]

17. All previous paragraphs of this Indictment are realleged and incorporated by reference as though fully set forth herein.

18. From in or around 2016 through in or around 2019, the exact dates being unknown to the Grand Jury, in the San Antonio Division of the Western District of Texas, and elsewhere, the defendant,

**CHRISTOPHER O'HARA**

did knowingly and willfully combine, conspire, confederate and agree with Person A and others, known and unknown to the grand jury, to commit certain offenses against the United States, that is,

    a. to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services in its administration and oversight of Medicare;

    b. to violate Title 42, United States Code, Section 1320a-7b(b)(1), by

knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare; and

    c.  to violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by Medicare; and for the purchasing, leasing, ordering and arranging for and recommending the purchasing, leasing and ordering of any good, item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare.

### Purpose of the Conspiracy

19. It was a purpose of the conspiracy for defendant **CHRISTOPHER O'HARA** and his co-conspirators to unlawfully enrich themselves and others, known and unknown to the Grand Jury, by paying and receiving kickbacks and bribes in exchange for doctors' orders for DME for Medicare beneficiaries.

## Manner and Means of the Conspiracy

20.  The manner and means by which **CHRISTOPHER O'HARA**, Person A, and others sought to accomplish the purpose and object of the conspiracy included, among other things, the following:

21.  **CHRISTOPHER O'HARA** operated 1stCare MD and ProfitsCentric to achieve the objective of the scheme to defraud: to unlawfully enrich himself and his co-conspirators by selling completed doctors' orders for DME in exchange for kickbacks and bribes on claims submitted to federal health care benefit programs.

22.  **CHRISTOPHER O'HARA**, 1stCare MD, and ProfitsCentric, through their network of doctors, were responsible for generating thousands of doctors' orders for DME.

23.  The doctors who signed the DME orders often did so regardless of medical necessity, in the absence of a pre-existing doctor-patient relationship, without a physical examination, and frequently based solely on a short telephonic conversation.

24.  Person A paid illegal kickbacks and bribes to ProfitsCentric and/or 1stCare MD, through Company A and Company B, in exchange for doctors' orders for DME.

25.  To conceal the illegal kickbacks and bribes, **CHRISTOPHER O'HARA**, Person A, and others created sham contracts and documentation that disguised the kickbacks and bribes as payments for "consults," "marketing," "hours," and business process outsourcing, among other services.

26.  During consensually recorded telephone calls, **CHRISTOPHER O'HARA** and Person A discussed their illegal scheme. Among other things, **CHRISTOPHER**

**O'HARA** and Person A discussed concealing the health care kickbacks and bribes, expanding their scheme by providing kickbacks in exchange for doctors' orders authorizing cancer screening tests and pain cream medications, and directing business to various pharmacies that **CHRISTOPHER O'HARA** controlled

27. From in or around 2016 continuing through in or around 2019, **CHRISTOPHER O'HARA**, through ProfitsCentric and 1stCare MD, caused DME companies to submit, and cause the submission of, approximately $40 million in claims to Medicare for DME. Medicare paid these DME companies approximately $20 million. These Medicare claims were based, in part, upon the doctors' orders that **CHRISTOPHER O'HARA** provided to Person A in exchange for illegal kickbacks and bribes.

### Overt Acts

28. In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the San Antonio Division of the Western District of Texas, and elsewhere, the following overt acts:

    a. In or around 2016, **CHRISTOPHER O'HARA**, on behalf of ProfitsCentric, entered into an agreement with Person A in order to provide purported "marketing" and "consulting" services to Person A's company.

    b. In or around May 2016, **CHRISTOPHER O'HARA** caused the submission of an invoice to Person A's company for purported "consults" in the approximate amount of $15,000.

c. In or around July 2016, **CHRISTOPHER O'HARA** caused the submission of an invoice to Person A's company for purported "consult performance" and "consults" in the approximate amount of $36,345.

d. In or around August 2016, **CHRISTOPHER O'HARA** caused the submission of an invoice to Person A's company for purported "consult performance conversion" in the approximate amount of $12,500.

e. In or around November 2016, **CHRISTOPHER O'HARA** caused the submission of an invoice to Person A's company for purported "consults" in the approximate amount of $42,500.

f. In or around April 2017, **CHRISTOPHER O'HARA** caused the submission of an invoice to Person A's company for purported "hours" in the approximate amount of $42,500.

g. In or around November 2017, **CHRISTOPHER O'HARA** caused the submission of an invoice to Person A's company for purported "hours" in the approximate amount of $42,500.

h. In or around April 2018, **CHRISTOPHER O'HARA** caused the submission of an invoice to Person A's company for purported "hours" in the approximate amount of $17,000.

i. In or around January 2019, **CHRISTOPHER O'HARA** caused the submission of an invoice to Person A's company for purported "hours" in the approximate amount of $17,000.

All in violation of Title 18, United States Code, Section 371.

## Notice of United States of America's Demand for Forfeiture
*[See* Fed. R. Crim. P. 32.2]

29.   The United States gives notice that it intends to forfeit certain property from Defendant **CHRISTOPHER O'HARA** upon conviction of the violations set forth in Count One pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 982 (a)(7), which states:

> (a)(7) The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

This Notice of Demand for Forfeiture seeks the forfeiture of any property, real or personal, including but not limited to, the Money Judgment described below:

**Money Judgment:** An amount of money which represents the proceeds obtained directly or indirectly as a result of the violations set forth above for which Defendant is liable.

**Substitute Assets**

If any of the property described above, as a result of any act or omission of Defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred, sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any other property of the defendant up to the value of the Money Judgment as substitute assets pursuant to Title 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2.

A TRUE BILL

███████████

FOREPERSON OF THE GRAND JURY

ROBERT ZINK
ACTING CHIEF, FRAUD SECTION

JOHN F. BASH
U.S. ATTORNEY

JOSEPH S. BEEMSTERBOER
DEPUTY CHIEF, HEALTH CARE FRAUD UNIT

By:

_____(Sor:)_____
KEVIN LOWELL
Trial Attorney
United States Department of Justice
Criminal Division Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Direct: (202) 262-7795

By:

_____(Sor:)_____
SEAN O'CONNELL
Assistant United States Attorney
U.S. Attorney's Office, WDTX
601 NW Loop 410, Suite 600
San Antonio, Texas 78216
Direct: (210) 384-7100